Good morning, Your Honors. May it please the Court. My name is Dennis Price for Appellant Scott Johnson. If possible, I'd like to reserve three minutes for rebuttal. There are countless quotes and idioms out there about houses that are built on shaky foundations collapsing. The fee dispute that's at the heart of this case is one of those houses built on a shaky foundation. It was supported by numerous decisions that predated this Court's admonitions in Roberts v. City of Honolulu, and those cases all rejected similar favorable cases that were actually properly decided. And so it's hard to imagine a world in which a case could be properly decided when all of its support is improper. Before I get into the heart of it, I want to address the elephant in the room. I understand that ADA litigation isn't popular. I hear it every single day in my practice. No one likes to be sued. In the United States, there's an idea that litigiousness is somehow wrong, and the Ninth Circuit has regularly had to step in and protect litigants from improper inferences and remind the trial courts that there's nothing wrong with serial litigation. In fact, the Ninth Circuit has gone out of its way to explain that it's even favored. When their discretion has been limited in other parts of the cases, courts have turned their attention to fee motions. And so I understand that conventional wisdom is you shouldn't The judges are abusing that discretion, and that's what's happened here. If we look to all of the rationale in support of fee shifting, the point is supposed to be to attract new counsel to this area of law. It's not happening. New counsel aren't joining. And in fact, our firm is the biggest firm in the state by far. And as far as market share, it's growing. We're not getting that kind of competition. And competition is the lifeblood of everything, whether it's economics, whether it's litigation. Without new blood being attracted to this area of law, we're not getting that burst of favorable representation. And I don't want to say... Yeah, Mr. Preissach, I have kind of a two part question. And one is, is there something particular in the record that supports the hourly rates that, the reasonableness of hourly rates that you proposed? And two, since you're almost a sample of one, how would a district judge go about figuring out how to do this in the way you think is proper? So that's my two part question. Yes, Your Honor, I'll try and address this separately. But my answer actually addresses both, I believe. The record has substantial support for it. We have a declaration from John O'Connor. He's a renowned expert in fee decisions. He did a survey of civil rights litigation, including ADA work, and found that our rates were on the very low end of that. And while we're the biggest... I guess that's the question I have is, he came up with a range of what would be reasonable. And what the district court picked was within the range that he suggested, wasn't it? Yes, Your Honor. But that range was based on those prior decisions that were decided in violation of Roberts v. City of Honolulu. That lower end range was literally our rates. I mean, maybe the district court can be faulted for relying on those prior cases, but that was your expert. If you thought that was an inappropriate methodology, he should have used some other method in coming up with his range. But he did, Your Honor. In his declaration, he explains that those cases are low, and he was differentiating from it. It was a cherry-picked quote from the suggestion that that's an acceptable range. He was just defining what was the actual range. I want to go back to Judge Rustani's question and answer further. We're not actually a sample size of one. We're the biggest, but we're not the only. I built a chart of one pretty frequent practitioner in the courts. Of her rates that she's gotten from 2008 until 2018 at the time, they've actually gone higher since. She does individual plaintiffs' ADA litigation, and her rates have gone up considerably over time. Those were disregarded as inapplicable to our cases. I cited to another attorney, Tom Frankovich, who got a higher rate from this trial court judge at $600 an hour. His case wasn't even considered as being relevant to us. In fact, his case was cited in one place. It wasn't for the sake of what was an appropriate rate, but merely recognizing that $700 an hour was too high without grappling with the fact that he was awarded $600. It just was rejected as not relevant. I think that's the issue that we have. In that case, though, they actually used the phrase, hold the line. I'm not sure I see that in Judge Davold's opinion. Rather, he seemed to be more concerned with the fact that it was a straightforward case and a boilerplate complaint. Yes, Your Honor. It was a straightforward case, but that doesn't mean that our skill was lower or that our experience was lower. What I would ask this court to do is to adopt the Eighth Circuit's rationale on Casey versus the city of Cabell, where the proper time value of a case is the opportunity cost of that case. We have lots of cases. Some of them are very straightforward. Some of them end up going up to the Ninth Circuit and changing the law. We don't always know when the case starts, which it's going to be. We're compensated appropriately in those cases because we do a lot of extra work in those cases. The Supreme Court in Purdue said that we're not really supposed to consider novelty in lodestar analysis. That comes on at the end. The expectation is that novelty will be represented in the amount of work that is done. If for some reason that you don't get a reasonable lodestar out of the lodestar method, Kerr can address that up or down if novelty is not being sufficiently reflected. Maybe the risk is too high or something of that sort. What we have here is an analogy to what happens in employment law. California and numerous other past laws make it illegal to inquire about prior salary history. The reason is because once you get assessed a below market salary, it becomes very difficult to address that if you just have a step increase after. Moreno is the equivalent of that in the Ninth Circuit. Roberts reiterated it. We still obligate the district courts with finding what the prevailing rate is. Yes, Your Honor, but if the district court is only willing to look at our cases and they're unwilling to reject cases that were decided improperly. In fact, a case that was cited, Showberry, was a case where our rate increase was rejected because we didn't support it with an expert opinion. We came back, we hired an expert, and then that case was now used as the prevailing rate. We have cases where we didn't seek a higher rate, and those ones are being the Shaw case. The court acknowledged that they were low for the district, but now that's the prevailing rate. We need to have the opportunity to fix the rate structure without reference to all these prior cases. That's the whole point of Moreno. Okay, you're down to about 240. Do you want to reserve? I would like to reserve the remaining. Thank you, Your Honor. Okay. We'll hear from the appellate. It's a pleasure to be in front of all of you judges. This is my appellate. Basically, I'm going to say that Judge D'Avilla was within his discretion to consider even the expert, and when he made the decisions for the reasonable rate, he actually fell in line with O'Connor's report. Interesting, O'Connor's report, the expert, did not render an opinion about this particular case facts. That was an opinion that was decided and prepared for a different case. Plaintiff cut and paste his particular decision and used it as a guideline. Within the guideline, the judge did not select the lower end. The lower end was like 300, and the judge gave 350 for the associates. Then on the lower end for the partners, it was the higher rate in San Francisco. It is true that the judge looked at and decided the Frankovich case and gave Frankovich 600, but Frankovich has 40 years of experience, more experience, and that was decided and noted also in the judge's opinion. In terms of being able to consider a reasonable rate, that's common. It happens all the time. The case that I would cite the court to is Gonzalez v. City of Maywood. It's a Ninth Circuit case decided in 2013. In that case, the judge looked at the complexity of the attorney's work, compared them to other civil rights work, and said that if it's complex, we'll give you more money. If it's simple and not so complex, like routine, you're not going to get your standard rate or high rate. What is interesting is in the moving papers, you will note that the plaintiff admits that they are asking for a higher rate, that they want a rate that's closer to Los Angeles's rates, and that's not the foreign market. I believe Judge Fevella made a thorough analysis of the cases. I do believe he looked at each of the attorneys and their experience, and he compared them to the more experienced attorneys who had the higher end. He also noted that in this case, there was nothing going on. If you look at the doc, if there was an answer, there was a complaint. A complaint, an answer. Can you tell me if there have been any recent cases in Northern District of California where the district judge has tried to update the rate from 2012? I don't know of any, but I will tell you that in the Chapman case, which was cited by Plaintiff's Counsel, they noted that they updated the Lafley schedule of rates, and that's the case, and that was a 19, I think that's a 2019 case, but it's the Chapman versus NJ Property Inc., and that's where the court mentioned updating the rates, and it was not long ago. And so what did they do? What did the court do? The court, I think the court in that case just followed the rates of, he just fell in line with what rates were there when the Lafley was updated. Okay. Did the judge go back? Was he sticking with the 2012 rates, and is that a disability case? Our particular judge did not use that case, and the Lafley case, and it's his opinion. Okay. He used, he basically was using prior cases of the plaintiffs. He basically used the rates of the same firm from 2012, right? Right. Well, no, he used only the rates in the last two years. He was very strict. The last two years were built on the 2012 rates, correct? Probably, yes, yes. And I will say that he did look at the two cases that the plaintiff's firm, where they did get a higher rate, and he said, well, those were complex cases, class action, it had to do with many businesses that were affected over state. And what I don't understand is, wouldn't that be reflected in the hours? You know, that's a good question. I think that the harder you work, and the more you work, the longer hours it takes. And so you do get a higher rate. But when you are simply filing a many hours, and so that's why this court felt they didn't deserve the higher rate and distinguished. The rates reduced because the amount they're going to get is reduced because they work very few hours, because they have experience, they have these boilerplate complaints, so they have very few hours. So I don't understand why that is reflects the why the rate should change because they have few hours. I'm not I'm not seeing the logic there. I don't think the court was saying that I think the court was just saying it's just straightforward work. He wasn't focusing on the number of hours. He said this is a routine case. He did reduce the hours in at least he did reduce the hours somewhat for certain reasons. And he did say that certain work should be done by associates and not the partner. Okay, that so that did happen. But that's not exactly what I'm talking about right this moment. Right, that did happen. But I don't think the judge was arbitrary in relying on the declaration of Potter realizing that Mark Potter doesn't have the same experience as Frankovich who got higher rate. And then the other attorneys they mentioned, in their decisions had more experience. So they got a higher rate. I just don't think I think you any also followed O'Connor's, you know, line of what he felt or range range of what he felt was reasonable. Could you address the reduction in the number of hours because I understood Moreno to say that the district court should not require everyone to operate the way you know, a large firm might where you have the partners delegating everything to associates. And so you shouldn't second guess the staffing decisions. And there does seem to be a flavor of that in saying that, you know, for example, Mr. Potter shouldn't have done the due diligence some other person should have. So what's your answer to that? I think that Potter Handy agrees and states that they have a division of labor with their law firm. And I'm used to working with their law firm where I will call up and deal with only someone who does settlement. And that's what I dealt with in this firm, I did not deal with someone who is very sophisticated in discovery, or law in motion, and those individuals probably get a higher rate. This was strictly settlement, the beginning of the case. And so I feel that the court was appropriate and lowering one, I think he lowered three hours. And associates rate, I don't really, really remember. But I think it was appropriate. We did give him an hour or so at his higher rate. I mean, he also, one other question along those lines, and I realize this is a pretty small in terms of the dollar amount effect, but he reduced Zimmerman's time for drafting the initial disclosures from four-tenths of an hour to one-tenth of an hour. You know, even if all you're doing is just, you know, making sure that the find and replace was done properly and that you have the right name of the case, you really think you could do initial disclosures in six minutes? You can, a paralegal can do it. This is Scott Johnson. I have had hundreds of cases against Scott Johnson. It's the same thing I get every day. And you don't even need an attorney to do it. You basically identify Scott, he identifies the same person who goes out and takes pictures. There's no insurance. You know, it's very simple. And then they identify how many pictures they took. So I don't think it takes that long to do something like that. That's boilerplate. Just to get this straight, I think Mr. Potter had requested more than three hours at his high rate, and the court granted him 0.3 hours at his high rate. Okay. Yes, that's true. I never talked to Mark Potter in these cases. I don't know. I think he, it's a supervisory role, and I think it's appropriate to have reduced his hours given how routine this case was. Basically, we just offered a rule 68 and they accepted it. Case was over. We're down to about 17, 16 minutes or seconds. Do you want to wrap up? No, I'm good. Thank you. Thank you very much. We'll hear rebuttal. Thank you, your honors. I want to address a few of the points that were made. The suggestion that this cut and paste expert disclosure center, we didn't hide that. We acknowledge that this was made for another case. It's extraordinarily expensive to hire a fee expert. It would dwarf the costs, and we didn't hold him out to be anything other than he was, so there shouldn't be any negative inference as to that. It's not particular to this case. That's the weakness of not retaining someone as a fee expert. Yes. You're arguing that the judge was basically engaging in pro forma fee review, and you gave him a pro forma affidavit from another case. Yes, your honor, but the point of that fee declaration wasn't about a particular case. It was about the skill and experience of the attorney, so it still should have been relevant. Similarly, I'm just saying it's pro forma. Understood. The experience issue was not actually held by Mr. Potter in the decision. It wasn't even addressed, and it's logical because Mr. Potter has over 25 years of experience. Most fee surveys cut off the point of increase about 20 years for experience because there's just diminishing returns, so I don't think there's any rationale that the Frankovich opinion or the Chapman case justified a higher rate. I do want to talk about that case. That was not one of ours. Judge Rossani asked about this. It wasn't based on 2012 rates because it wasn't based on our rates at all. It was based on Mr. Frankovich's rates, who does the exact type of litigation that we do. Mr. Frankovich was seeking an adjustment based on the Martin v. Diva decision, which in that decision stated it was not based on complexity, that that was reflected in the total hours, and as a result, this judge gave Mr. Frankovich $600 an hour, so it was just a completely different case. I also want to draw attention to the efficiency argument that Ms. Corpi brought this up, sort of suggesting it was a negative. We have one of our most junior attorneys doing bulk work in these cases. That's to save time and money. Ms. Corpi is not dealing with Mr. Potter on routine issues because he bills at a higher rate. That's a benefit to our system. It shouldn't be held against us, and I also just want to point out that these aren't theoretical problems. This was a Rule 68 case. Rule 68s are fantastically powerful tools to be used against a plaintiff, and we need to be able to know what our case rate is going to be at the end of the case because we have to assess that at the beginning. If someone brings in a whole dollar Rule 68 amount, we need to be able to know if we're going to be able to beat that or not, and if we get a lower rate early in the case versus late, we can't do that, and it just breaks the entire system, so I'd ask the court to adopt the capital test and reiterate what we know. Thank you, Your Honors. Thank you, counsel. Thank you both for your arguments this morning. The case just argued will be submitted for decision, and we'll proceed to the next case on the oral argument calendar, which is Manzanilla versus Carlin. Thank you.
judges: Thomas, Restani, Miller